## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DR. ROBIN J. HAYES,

      Plaintiff,

      v.

THE NEW SCHOOL, DAVID VAN ZANDT,
individually and in his capacity as President of The New
School, TIM MARSHALL, individually and in his
capacity as Provost of The New School, BRYNA
SANGER, individually and in her capacity as Deputy
Provost and Vice President Academic Affairs for The
New School, KEILA TENNENT-DECOTEAU,
individually and in her capacity as Vice President for
Labor Relations for The New School, MARY
WATSON, individually and in her capacity as
Executive Dean of The Schools of Public Engagement,
and MICHELLE DEPASS, individually and in her
capacity as Dean of the Milano School of Policy,
Management, and Environment,

      Defendants.

**Case No.**

**COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY**

Plaintiff, Dr. Robin J. Hayes, by and through her attorneys, Eisner & Dictor, P.C., hereby

complains against Defendants, jointly and severally, as follows:

### NATURE OF THE CASE AND INTRODUCTION

1.     Plaintiff, Dr. Robin J. Hayes ("Plaintiff" or "Dr. Hayes") brings this action pursuant

to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § § 2000e to 2000e-17 (amended

in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII"), 42 U.S.C.

§ 1981 ("Section 1981"), the Administrative Code of the City of New York and the laws of the

State of New York, seeking damages to redress the injuries she has suffered and continues to suffer

1

as a result of the Defendants' discrimination against her based on her race, color, gender, and sexual orientation—which included tokenism, disparate treatment, harassment, and a hostile work environment over a period of several years despite her consistently excellent job performance. Plaintiff further seeks redress for damages she has incurred and will continue to incur because of Defendants' retaliation against her for engaging in the protected activities of making complaints about the aforementioned discrimination. This retaliation included attempts at constructive discharge and the wrongful termination of her employment at The New School. Last, Plaintiff seeks the past and continuing damages she has incurred due to The New School's breach of her employment contract.

2.      Defendant The New School—a tax-exempt nonprofit charitable organization charged with acting in the public interest—promotes itself as a progressive, boundary-challenging university, promising its faculty, students, and staff a culturally dynamic learning and teaching environment that is rich in racial, gender, economic, and ethnic diversity.

3.      The New School describes itself on its Twitter profile as: "[a] university in New York City for scholarly activists, fearless artists, and convention-defying designers. We welcome dissent" (https://twitter.com/TheNewSchool, last visited July 9, 2018).

4.      Unfortunately, the reality for many is quite the opposite. The facts in this case reveal that The New School and its top tier of administrative leadership—including President David Van Zandt, Provost Tim Marshall, Senior Vice President of Academic Affairs and Deputy Provost Dr. Bryna Sanger, Vice President for Labor Relations Keila Tennent-DeCoteau, Schools of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michele DePass—consistently engage in conduct that perpetuates the exclusion of faculty and students who are members of one or more protected classes (including Dr. Hayes) and severely punishes speech and action that actively promote equality and inclusion of protected class members within the

2

University.

5.      Prior to The New School using her to neutralize criticisms over its glaring lack of diversity, equality and inclusion, Dr. Hayes's prospects as a rising star in African American studies were boundless.

6.      The Defendants' repeated failure to meet their responsibilities under New York City, New York State, and federal laws to honor Dr. Hayes's human rights and employment contract have destroyed her academic career, impaired her scholarship, tarnished her reputation, and caused her untold financial and emotional injuries.

7.      Upon information and belief, Defendants' unlawful conduct is part of The New School's larger, persistent, and historic pattern of discrimination and retaliation against employees and students on the basis of race, color, gender, and sexual orientation.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction based on 28 U.S.C § 1331 and 1343 and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

9.      On or around April 12, 2018, the Equal Employment Opportunity Commission ("EEOC") mailed Dr. Hayes her Right to Sue Letter from the Charge of Discrimination Plaintiff filed with the EEOC on or about September 12, 2017 (attached hereto as Exhibit A). Plaintiff received the same on April 16, 2018. Plaintiff's EEOC Charge Number is 520-2017-003687.

10.     Plaintiff has satisfied all administrative prerequisites and is filing this action within ninety (90) days of receiving their respective Right to Sue Letter pursuant to 29 CFR § 1601.28.

11.     Venue is proper in this District based upon Defendants' place of business during all material times within New York County, State of New York, within the Southern District of New York under 28 U.S.C. § 1391(b).

## PARTIES

12.     Plaintiff Dr. Robin J. Hayes ("Dr. Hayes" or "Plaintiff") is a resident of the State

of New York, County of Kings. As a dark-skinned African American lesbian woman born in East

Flatbush, New York to a family of modest means, Dr. Hayes distinguished herself at an early age

as a dedicated student, earning admission to prestigious St. George's School in Newport, Rhode

Island with a scholarship from the A Better Chance program. She earned a BA with honors from

New York University and is the first person to graduate from Yale University with a joint PhD in

political science and African American studies. Prior to graduate school, she helped The Urban

Justice Center to provide legal services to homeless adults and organized humanitarian aid

caravans to Mexico, Central America and the Caribbean with the Inter-religious Foundation for

Community Organization (IFCO).

13.     Defendant, The New School ("The New School," or "the University") is a non-

profit corporation registered in New York State that provides undergraduate and graduate

educational services domestically and internationally. The University has employees in excess of

2000 persons in various locations in New York City and abroad with its principal location at 66

West 12th Street, New York, NY 10011.

14.     Defendant David Van Zandt ("President Van Zandt") is a White heterosexual male

who is and was at all material times, The New School's President and had supervisory authority

over Dr. Hayes. Upon information and belief, he is a resident of the State of New York, County of

New York.

15.     Defendant Tim Marshall ("Provost Marshall"), is a White heterosexual male who

is and was at all material times, the Provost and Chief Academic Officer of The New School,

Associate Professor with tenure at The New School, and had supervisory authority over Dr. Hayes.

Upon information and belief, he is a resident of the State of New York, County of New York.

4

16.     Defendant Bryna Sanger ("Vice President Sanger") is a White heterosexual female who is and was at all material times, the Deputy Provost, Senior Vice President of Academic Affairs, a tenured Full Professor of Urban Policy Analysis and Management at Milano School for International Affairs, Management and Urban Policy of The New School. At all material times Vice President Sanger had supervisory authority over Dr. Hayes. Upon information and belief, she is a resident of the State of New York, County of New York and County of Suffolk with a primary place of business in the County of New York.

17.     Defendant Keila Tennent-DeCoteau ("Vice President Tennent") is an African American female who is and was at all material times the Vice President of Labor Relations at The New School and had supervisory authority over Dr. Hayes. Upon information and belief, she is a resident of the State of New York, County of Westchester with a primary place of business in the County of New York.

18.     Defendant Mary Watson ("Dean Watson") is a White heterosexual female who is and was at all material times: the Executive Dean of the Schools of Public Engagement, Interim Dean of the Milano School of International Affairs, Management and Urban Policy, Associate Dean of Faculty Affairs at Milano School of International Affairs, Management and Urban Policy, Chair of the Management Programs at The New School, an Associate Professor without tenure at The New School; and had supervisory authority over Dr. Hayes. Upon information and belief, Dean Watson is a resident of the State of New York, County of Kings with a primary place of business in the County of New York.

19.     Defendant Michelle DePass ("Dean DePass") is an African American heterosexual woman who was at all material times, the Dean of the Milano School of International Affairs, Management and Urban Policy at The New School, University Professor without tenure at The New School; and had supervisory authority over Dr. Hayes. Upon information and belief, Dean

5

DePass is a resident of the State of Oregon, County of Multnomah who at material times had a primary place of business in the County of New York.

## FACTUAL ALLEGATIONS

### A.    Historic Lack Of Diversity, Equality And Inclusion At The New School

20.    Statistically the New School registers a relatively robust representation of students who identify themselves as people of color when compared to similar private universities.

21.    Yet the New School achieves this statistic through its high percentage of international students that make up 25% of its student body.

22.    In reality, for years, the New School has struggled with underrepresentation of domestic students of color and tenure track/tenured faculty members of color.

23.    It has also struggled with providing resources to fully support the inclusion of all students and faculty members of color.

24.    So disturbing has the New School's practice of denying tenure to faculty of color that, in 1997 students revolted when the New School denied tenure to Dr. M. Jacqui Alexander, an African American lesbian professor at Eugene Lang College, culminating in mass student hunger strikes and a five-hour occupation of the administrative building and hostage taking of the Provost and Vice President.

25.    There has not been an African American lesbian promoted to tenure at The New School since this incident.

26.    Acknowledging its diversity problem in terms of race, class, gender and sexual orientation presented a threat to the school's ability to market its progressive social justice and innovation brand, in July 2009, The New School secretively commissioned a report called "Desegregating Diversity: From Myth to Mandate."

27.     The Report identified a "lack of tenured and tenured-track faculty of color", and "absence of senior leadership of color throughout the university" and "very limited resources dedicated to planning, coordination, evaluation and oversight of current "diversity" efforts" as "institutional barriers."

28.     After the Report was leaked in 2010, The New School faced public scrutiny over its abysmal lack of tenure track and tenured faculty members of color.

**B.      The New School Enters into an Employment Contract with Dr. Hayes to Quell Public Outrage Over Its Lack of Diversity**

29.     In response to the scandal over the leaked report, in the Spring of 2010, The New School sought to add Dr. Hayes to its tenure track faculty.

30.     At this time, Dr. Robin J. Hayes, an internationally recognized scholar, filmmaker and nonprofit practitioner focused on African American studies and social justice, was thriving in a tenured track position with Santa Clara University in California.

31.     She was 37 years old and at the beginning of what was certain to be a brilliant academic career—having already been funded by the Ford Foundation; offered several tenure track positions and resident fellowships from top tier colleges and universities; as well as successfully published academic work and created an internationally recognized documentary film.

32.     Dr. Hayes was not only a female African-American; she was an out lesbian openly supportive of LGBTQ equality.

33.     On information and belief, The New School identified Dr. Hayes as an excellent candidate to placate the voices calling for tenured and tenure track faculty who were something other than heterosexual white males in traditional disciplines.

7

34.     To convince Dr. Hayes to leave her prestigious tenure track appointment with Santa Clara University, The New School promised her a position at the Schools for Public Engagement (SPE), then named the New School for Public Engagement), which supported scholarship, teaching and service that actively engaged general non-academic audiences.

35.     Dr. Hayes's position was also to promote learning and scholarship that advanced knowledge about culture and structures of inequality.

36.     On June 7, 2010, The New School presented Dr. Hayes with a contract "to join its faculty of the Milano School of Management and Urban Policy as a Tenure Track Assistant Professor position in its Non-Profit Management and Urban Policy."

37.     In recognition of the breadth of her scholarship, she was also offered courtesy appointments in the international affairs and media studies programs.

38.     The employment contract specified that the terms and conditions of her employment would be governed by The New School's policies set forth in the Full-Time Faculty Handbook.

39.     Among its other terms, the employment contract specified that Dr. Hayes's initial tenure track appointment would run from July 1, 2010 to June 30, 2013.

40.     In her third year, Dr. Hayes would "stand for '[her] post-probationary review, at which time she would be eligible for a contract review."

41.     The contract also provided that:

> [i]n recognition of your experience as a teacher and researcher to date, you will stand for your post-probationary review in your third year of your appointment, 2012-2013. At that time, you will be eligible for a contract renewal, in accordance with the guidelines of the University. This review is normally done in the fourth year on a tenure track. You may request clock relief so that the review will take

8

place in the fourth year, 2013-2014. Assuming successful review of your teaching, scholarship and service, you will be given a contract extension through June 30, 2016. You would be reviewed for tenure with promotion to Associate Professor in the sixth year of your appointment, 2015-2016.... In addition, assuming a successful post-probationary review, you may request an early review for tenure. Tenure is within the Milano School.

42.     After the premature death of her mother in May 2012, Hayes requested an extension to her tenure clock as a precautionary measure in accordance with The New School's bereavement extension policy and her contract.

43.     The New School granted the extension and post-probationary review was subsequently scheduled for Summer 2014 and her contract extended through July 2019.

44.     Under the terms of the contract, she would be evaluated for promotion to tenure no later than July 2017.

45.     If promoted to tenure, Dr. Hayes would be eligible for review for promotion to the rank of Full Professor provided she engaged in additional significant scholarly, teaching and/or service achievements.

46.     After being granted tenure, Dr. Hayes would have had a lifelong contract at The New School.

47.     The contract also promised support for Dr. Hayes's scholarship in the field of African-American studies, including her first semester consisting of a paid leave to participate in the Scholar-in-Residence Program at the Schomburg Center for Research and Black Culture and the New York Public Library.

48.     Specifically, the contract stated, "Normally, faculty members are not eligible for paid leave before a successful post-probationary review; however, we are granting you this leave

earlier because of your previous commitment to the Schomburg Center and in order to support your work there."

49.     No later than her sixth year, Dr. Hayes was to be reviewed for tenure with promotion to Associate Professor.

50.     The Faculty Handbook states that "for promotion and tenure-track faculty will be evaluated by the following criteria: scholarship, which can be creative work, academic research, or professional practice that makes a national and/or international impact, teaching, and service to the profession or community."

51.     According to the Handbook, tenure-track faculty members must demonstrate a standard of excellence in scholarship as well as teaching or service to be promoted to tenure.

52.     In sum, The New School promised support and enthusiasm for Dr. Hayes's scholarship, which is focused on advancing learning about race and equality through teaching, service, academic research, creative practice, and nonprofit professional practice.

53.     Given the competitiveness of her qualifications, and the fit between her demonstrated commitment to social justice and The New School's public proclamations of similar support, Dr. Hayes believed The New School had negotiated and entered into their contract in good faith.

54.     After Dr. Hayes began her employment, however, The New School's engrained devaluation of its faculty who are women, darker skinned, of color and LGBTQ became evident.

55.     High ranking University officers withheld support essential in gaining tenure and actively thwarted Dr. Hayes's efforts to be promoted according to the terms of her contract.

## C.     At The New School, Dr. Hayes Distinguishes Herself as a Scholar and Social Justice Leader of the Highest Caliber

56.     Dr. Hayes was hired to contribute to Milano's teaching and scholarship around culture, social equality, and the nonprofit sector and joined the faculty of The New School as an

Assistant Professor of International Affairs, Management, Media Studies and Urban Policy on January 1, 2011.

57.     At all times, Dr. Hayes was an exemplary faculty member, fully performing under the terms of her appointment contract.

58.     The New School featured Dr. Hayes on its website with a professional photograph showcasing her as a dark skinned African American female professor whose scholarship in African American studies appeared dynamic and supported by the University.

59.     She exceeded the limited expectations placed on her by University officials as a "diversity hire" by creating award-winning creative work, academic research, and professional practice that made a national and international impact as well as pursuing excellence in her teaching and service.

60.     Her work was consistently competitive with similarly situated colleagues who were not members of protected classes.

61.     Consistent with her areas of expertise and the mandate for her hire, Dr. Hayes taught the following classes: "International Black Social Movements," "Making a Difference," "Social Justice Cinema: Marginalized Realities and Advocacy in Film," "Social Justice Leadership," "Why Leadership Matters: Power or Potential."

62.     These courses explicitly addressed race, ethnicity, gender, sexual orientation, and inequality through class discussions, assigned readings and public engagement exercises in partnership with Dr. Hayes's project Progressive Pupil – a nonprofit that utilizes media to "make Black studies for everybody."

63.     Student evaluations and The New School's faculty performance evaluations consistently bestowed Dr. Hayes with affirmation for above average teaching, scholarship, and service.

64.     This achievement is particularly remarkable given that the majority of Dr. Hayes' students during this period were White due to lack of diversity at The New School.

65.     Beginning Fall 2011, Dr. Hayes established the highly successful New Leaders for Social Change internship program that provides hands-on experience for students who are pursuing careers in nonprofit leadership and media-making; from communities who are underrepresented in those fields and/or who are committed to promoting diversity in those fields.

66.     Dr. Hayes created the acclaimed award-winning feature film "Black and Cuba," which began exhibiting at prestigious film festivals, campuses, community-based organizations and other stakeholders throughout the US and internationally in February 2014.

67.     The documentary is also streaming on iTunes, Google Play, Kanopy, and Amazon.

**D.      The New School Subjects Hayes to an Array of Disparate Treatment Due to Her Race, Color, Gender and Sexual Orientation**

68.     Despite her substantial scholarly, teaching, and service contributions, The New School subjected Dr. Hayes to discriminatory disparate treatment on the basis of her race, color, gender, and sexual orientation.

69.     By way of example, contemporaneously to hiring Dr. Hayes, The New School hired a heterosexual White female PhD from the University of California, Berkeley, as a tenured track Assistant Professor in the Milano School of Nonprofit Management – the same position and school as Dr. Hayes.

70.     The New School continuously provided this White Heterosexual Assistant Professor with appropriate, consistent and meaningful mentorship, post-hire support for her teaching and scholarship, functional equipment, a "partner hire," and review for and promotion to tenure.

71.     In contrast, The New School denied each of these terms of employment and promotion to Dr. Hayes.

72.      Between the Spring 2015 and Spring 2016, The New School breached its contract and repeatedly denied Dr. Hayes scholarship support in the form of a replacement computer, while such support was routinely provided to similarly situated White, heterosexual and/or male faculty.

73.      Additionally, while The New School claimed to have fired Dr. Hayes for notifying students that their class might be cancelled due to low enrollment, this same White heterosexual Assistant Professor engaged in identical conduct and suffered no adverse employment action. Rather, the University promoted her to tenure.

74.      Further, while The New School claimed to have fired Dr. Hayes for conduct sanctioned by the University, The New School allowed one of its White heterosexual male faculty members to quietly resign in the wake of allegations of egregious sexual misconduct with students, including unconsented sexual intercourse, orgies, and a pressured abortion. It is well-understood in the academic community that permitting a faculty member to resign may preserve their career, while termination is ruinous of a faculty member's reputation and almost certainly forecloses the opportunity for future academic employment.

75.      Upon information and belied, The New School's lax treatment allowed this White heterosexual male faculty member to land a job at Stanford University, only to be fired when Stanford found out about the sexual misconduct through its student newspaper.

76.      Additionally, while The New School denied Dr. Hayes's request for early tenure review, the University offered similarly situated non-Black male assistant professors early tenure review.

77.      While denying Dr. Hayes support for her faculty-student collaboration, The New School provided comparable support for similar faculty-student collaboration during the same period taught by heterosexual and/or White faculty members.

78.     None of the similarly situated faculty members who have been granted opportunities to lead experiential learning programs that promote civic engagement and/or diversity, similar to Dr. Hayes' proposed Hip Hop, Media and Democracy Lab, are members of protected classes because of their race or color.

79.     The University consistently offered promotions to executive leadership positions and supplemental teaching opportunities to White, heterosexual, and/or male faculty, while denying them to Dr. Hayes.

80.     For example, in August 2015, the New School promoted Michael Park, a White man, to Chair of the Management program where Dr. Hayes is based. Park had no previous full-time university teaching experience and no previous academic experience.

81.     The New School also promoted Park to Associate Professor from part-time lecturer.

82.     Park was offered more summer salary for his work than he was willing to accept.

83.     Upon information and belief, several of Dr. Hayes' similarly situated Management colleagues, who were not members of the same protected classes as Hayes because of their race or color, were also considered for this position, while Hayes was never considered or invited to apply.

**E.      The New School Marginalizes Dr. Hayes's African American Studies Teaching, While Welcoming Similar Programs by Faculty who are not African American Lesbian Women**

84.     In Fall of 2014, Dr. Hayes sought to teach a Hip Hop, Media-Making and Democracy Lab.

85.     She devised the lab in response to a call from the Milano Dean to develop summer programs similar to Milano's International Field Program, but based in New York.

86.     The Hip Hop, Media-Making and Democracy Lab would provide undergraduates from outside of The New School with scholarly background in race and inequality as well as hands-on media training.

14

87.     On information and belief, The New School administrators—including Provost Tim Marshall, Deputy Provost Bryna Sanger, and Executive Dean Mary Watson—perceived the Hip Hop, Media Making and Democracy Lab as attracting Black students with "thuggish" characteristics, given the University's sophomoric understanding of Hip Hop's prominence in universities around the world.

88.     The New School lacked any consistent Hip Hop curriculum, in contrast to the widespread presence of Hip Hop studies at nearly all universities in the country—including Harvard and Princeton.

89.     In fact, it is difficult to find a top tier college or university that lacks Hip Hop as a field of study.

90.     To facilitate the Lab's approval, Dr. Hayes provided Executive Dean Watson and Milano Dean DePass with a detailed budget and course description.

91.     In Fall 2014, when Dr. Hayes met with Executive Dean Mary Watson, who is White and heterosexual, to discuss the curriculum, Watson proceeded to announce that she was inspired to attend a "White Privilege Conference" because her daughter was the result of a transracial adoption.

92.     Watson also told Hayes that once, when Watson was on a subway train with her daughter, her daughter pointed out that Watson did not notice how people were staring at her with hostility because her daughter was a person of color.

93.     Watson told Dr. Hayes that she no longer believes in "transracial adoption" but has learned to forgive herself.

94.     There was no academic reason for Watson to mention transracial adoption and or the White Privilege Conference when discussing Dr. Hayes's Hip Hop, Media-Making and Democracy Lab course.

95. Watson also did not express any pedagogical concerns about the program.

96. Dr. Hayes was offended by these comments and felt Watson was attempting to racially marginalize her.

97. Additionally, Watson stated that The New School's "Budget Office" would not approve any aspect of the program that involved supporting faculty-student collaboration with Dr. Hayes's ongoing civic engagement project, Progressive Pupil.

98. In a March 2016 meeting with Provost Marshall, DePass and Watson to discuss Dr. Hayes's contract negotiations, Watson opined that "senior faculty" would not appreciate the Hip Hop, Media-Making and Democracy Lab, without offering any explanation or providing any concrete examples of which senior faculty she was referring to.

99. Between Fall 2015 and the end of her employment, in further discouraging Dr. Hayes's effort to teach the Hip Hop Media-Making And Democracy Lab, the New School routinely ignored Dr. Hayes's requests for curricular needs and further scholarship support.

100. Yet the curriculum at top US universities, including Princeton, Harvard, Columbia and NYU include senior faculty teaching and researching Hip Hop and similar subject matter.

101. Watson's statement had no academic legitimacy, but rather was racially coded language intended to demean the Dr. Hayes's scholarly merits.

102. During and prior to Hayes' employment at The New School, the University approved several similar supplemental programs by similarly situated faculty based on their fields of expertise. However, none of these programs were led by dark-skinned, African American, lesbian women.

103. Upon information and belief, in April 2017, shortly after Dr. Hayes was terminated, The New School accepted a major gift from musician, designer and philanthropist Beyoncé Knowles-Carter. The gift was part of the Formation Scholars program that had been established

by Knowles-Carter with the aim to "encourage and support young women who are unafraid to think outside the box and are bold, creative, conscious and confident." The program had been established in celebration Mrs. Knowles-Carter's *Lemonade* music and visual album, which featured contributions from Pulitzer Prize-winning hip hop artist Kendrick Lamar and Grammy winning hip hop artist Jay-Z.

### F. The New School Denies Dr. Hayes Compensation Parity with Similarly Situated White Heterosexual Faculty

104.    Between Fall 2014 and Spring 2015, Dr. Hayes persisted in acquiring permission to move forward with the Hip Hop, Media-Making and Democracy Lab.

105.    Eventually Watson approved the program, but only at a salary that was significantly lower than that usually offered tenure-track faculty for teaching and directing summer programs.

106.    In her preparatory documentation for the pre-Post-Probationary Review meeting, Hayes also requested a workload consideration for her work with the New Leaders for Social Change program, which had been approved by a grant from the previous Executive Dean of SPE.

107.    The New School's policy is to grant full-time tenure-track faculty course relief from their standard five courses per academic year for "extraordinary service" so that faculty are not working overtime without compensation.

108.    Dr. Hayes spent approximately 25 hours per week through the fall, spring and summer semesters supervising the program and working with students, well in excess of the New School's single course expectation of less than 40 hours per semester.

109.    At the post-probationary review prep meeting, Watson, Ling, Ponte and DePass refused to consider Dr. Hayes's request for workload consideration without explanation.

110.    In Fall 2014, Dr. Hayes wrote to Milano Dean DePass about disparity between her salary and reported average salaries of Assistant Professors at The New School.

111.    DePass failed to respond to the inquiry.

112.     The New School documents show supplemental salary is approximately $150 per classroom hour plus compensation for course preparation time. The Hip Hop, Media-Making, and Democracy Lab was 150 classroom hours over five weeks.

113.     The New School offered Dr. Hayes well below 50% of the appropriate salary and no compensation for preparation for this program.

114.     From 2014 through the date of her termination, the New School continued to deny Dr. Hayes compensation and teaching opportunities afforded to white heterosexual faculty members.

115.     For example, in spring of 2015, a white male Assistant Professor confirmed in a Milano faculty meeting that for his supplemental teaching, he received a proportional supplemental pay scale (i.e., for 3 additional credits, one would receive 20% academic year salary).

116.     Dr. Hayes proposed at various times to Watson, Marshall, DePass and Vice Provost of Faculty Affairs Bryna Sanger the same proportional supplemental pay scale for her supplemental teaching. Those proposals were denied.

117.     And while the New School denied Dr. Hayes teaching and equal supplemental salary opportunities, the University approved the UN Summer Field Program in Milano and offered another White male part-time lecturer, a salary to run the program that brought his part-time salary to full-time compensation.

118.     From February 2016 through October 2016, Dr. Hayes repeatedly requested information about the salary range of her colleagues, so she could gauge the fairness of the raise she was offered.

119.     The New School repeatedly denied her request.

120.     The New School continued to pressure Dr. Hayes to drop her focus on race and diversity, for example refusing to grant a courtesy appointment in the Race and Ethnicity program,

18

equitable salary to teach the Hip Hop, Media-Making and Democracy Lab, or equitable workload recognition for the New Leaders for Social Change program.

121.     In further discouraging Dr. Hayes's effort to teach the Hip Hop Media-Making And Democracy Lab, the New School routinely ignored Dr. Hayes's requests for curricular needs and further scholarship support.

122.     The New School refused to consider a partner hire for Dr. Hayes's same-sex partner who was eminently qualified for such an appointment, despite multiple requests for such consideration.

123.     Upon information and belief, the only similarly situated tenure-track faculty members in Milano who have received consideration for partner hires between 2011 and 2017 are heterosexual.

124.     While claiming that Dr. Hayes's contract demand for housing assistance was out of line with the benefits offered to its faculty, in the Spring of 2015, The New School offered Professor Servon, a White heterosexual female, a compensation package that enabled her to purchase a home.

125.     According to data available from the Schools of Public Engagement (SPE) and Milano websites, none of the similarly situated tenured/tenure-track faculty members who have received course load recognition and salary for their administrative duties and/or opportunities for administrative leadership in Milano or SPE Executive Dean load recognition, as Dr. Hayes requested with the New Leaders for Social Change program she founded, are members of protected classes because of their color or sexual orientation.  Only one is African American.

126.     Though the New School told Dr. Hayes to "do less around diversity" during her post-probationary review, The New School awards the Diversity and Social Justice Teaching Prize to faculty.

19

127.    Dr. Hayes has only been nominated for the award.

128.    No similarly situated faculty who have won the award during the past six years is a member of a protected class because their race, color or sexual orientation.

129.    According to The New School's data, two of the 39 faculty members who were promoted to the rank of Associate Professor with tenure at The New School in 2016, 2015, 2012 and 2011 were African American women.

130.    No openly lesbian faculty member received tenure during this time.

131.    None of the faculty members has skin as dark or darker than Hayes.

132.    Between Fall 2014 and the termination of her employment, Dr. Hayes repeatedly requested that Dean DePass, Executive Dean Watson, Deputy Provost Sanger, Provost Marshall, Irwin Kroot, Interim Vice President of Human Resources, and Ilana Levitt, Senior Director of Employee Development and Organizational Effectiveness (in the Human Resources Department) to address publicly-available statistical reports that showed her existing compensation and proposed compensation was not equal to that of similarly situated colleagues who were not members of the same protected classes. These requests were repeatedly denied or ignored.

### G.    The New School Fails to Evaluate Dr. Hayes for Tenure or Promote Her to a Tenured Appointment

133.    The New School had set Hayes' post-probationary review deadline as August 2014.

134.    The function of this process is to provide tenure track professors with extensive feedback about their progress toward tenure and provide the University with the opportunity not to renew a contract if a professor's performance is found too deficient to correct before review for promotion and tenure.

135.    In the Fall of 2013, Mary Watson, an Associate Professor without tenure and alumnus of the University of Kentucky, became Interim Dean of the Milano School of International Affairs, Management and Urban Policy.

136.     Around March 2014, the New School instructed Dr. Hayes to meet with Watson, DePass, Cecilia Ponte (School of Public Engagement Assistant Dean of Full-Time Faculty Affairs), and Lily Ling (Associate Dean for Faculty Affairs) to discuss Dr. Hayes's post-probationary review process.

137.     To facilitate a productive meeting, Hayes provided Watson, DePass, Ponte and Ling in advance with documents summarizing her achievements in scholarship, teaching and service, as described above.

138.     At this meeting, Hayes exercised her contractual right to request early review for tenure pending a successful post-probationary review.

139.     Watson, DePass and Ling failed to respond to Dr. Hayes's request for early tenure review.

140.     In May 2014, The New School promoted Mary Watson to Executive Dean of the Schools of Public Engagement Division.

141.     However, Watson remained an Associate Professor without tenure, thus making supporting Assistant Professors, like Dr. Hayes, for tenure an endeavor against her own self-interest.

142.     In Fall 2014, Dr. Hayes once again asserted her rights under her contract and requested the New School review her for tenure in July 2015, following a successful post-probationary review.

143.     Executive Dean Watson denied her request, saying that there was no way to know when the post-probationary review would be completed and therefore the request could not be honored.

144.     In reality, the post-probationary review is always completed before the end of Spring semester, exposing the pre-textual reason for declining Dr. Hayes's request.

145.    Reinforcing that Watson's explanation was pure pretext, within weeks of Executive Dean Watson's claiming it an impossibility to know when the post-probationary review would be completed, Dr. Hayes's former mentor, Associate Professor Ling, disseminated a review calendar to full-time faculty in February 2015 outlining precisely when post-probationary review would be completed.

146.    The calendar dates predictably reflected that the post-probationary review would be completed prior to the conclusion of Spring semester 2015.

147.    Unwilling to accept the University's marginalization, Dr. Hayes pressed her right for early tenure review, to which eventually Watson stated she would "consider it further."

148.    Nonetheless from November 2015 – February 2016, Executive Dean Watson failed to act on Dr. Hayes's request for early tenure review.

149.    During this time, at least two similarly situated full-time, tenure-track faculty members who were not members of protected classes due to their gender or skin color were granted early tenure review.

150.    Hayes' academic dossier included excellence in all three areas of eligible scholarship—professional practice, creative work and academic research. The approved faculty only possessed qualifications in creative work or research.

151.    In Spring 2016, when Dr. Hayes renewed her request, Executive Dean Watson again denied it stating that "it usually takes two years" between requests for early tenure review, completion of the post-probationary review and the ability to submit a dossier."

152.    Executive Dean Watson's claims directly contradict the New School's Faculty Handbook, which provides that requests for early tenure review must be made earlier than May 1 before the dossier submission in July or August of that year – a period of four months rather than two years.

153.     The academic calendar disseminated by Associate Professor Ling also confirmed that the tenure review process runs well under two years.

154.     In early Spring 2015, Dr. Hayes requested a meeting with Dean DePass and Dean Kruscheva to clarify when she would be evaluated for tenure.

155.     During the meeting Dr. Hayes asked for suggestions on how she could advance her contributions to the University.

156.     DePass refused to offer suggestions. Kruscheva answered that, "promotion is the only way to advance."

157.     During Hayes's May 2015 meeting with Deans Watson, DePass, Kruscheva, and Ponte following her successful completion of post-probationary review, Watson and Kruscheva again misinformed Dr. Hayes by stating she was required to build relationships with faculty in Media studies, where she had a courtesy appointment.

158.     This instruction amounted to telling Dr. Hayes "to start over" in the tenure process with a different program.

159.     As the University has a set timeframe during which tenure track professors are to obtain tenure or leave the University, this "start over" instruction signaled an intent to deny Dr. Hayes tenure.

160.     Watson also encouraged Dr. Hayes to engage in a variety of low-level service activities for Media Studies that were likely to detract from her scholarship and did not provide any opportunities for leadership.

161.     Such low-level service activities are not considered relevant to the tenure evaluation and are commonly assigned to junior faculty members who are women and people of color.

162.     Instructing Dr. Hayes to take time away from her scholarship and perform "housekeeping" services for the University further telegraphed the University's discriminatory

intention to constructively discharge Hayes before she could be considered for promotion with tenure.

163. Kruscheva misinformed Hayes about the New School's tenure standards stating, "you need [to publish] a book for tenure."

164. Prior to this meeting, the New School had evaluated Dr. Hayes's performance regularly and never once informed her that her film work would not count toward her tenure portfolio.

165. Watson also informed Hayes that the New School's general standard for promotion to tenure is "one completed project and progress toward a second," which also contradicted the University's Faculty Handbook.

166. At the start of the meeting, Watson pronounced that Ponte would be taking notes of the meeting and later send Dr. Hayes a written record.

167. Despite Dr. Hayes's repeated requests, The New School failed to provide the notes of the meeting.

168. Dr. Hayes was eligible for tenure in May 2015, but the New School denied her the promotion review.

169. In Fall 2015, Dr. Hayes complained to Vice Provost Stefania deKenessey, who was charged with assisting junior faculty through the tenure process, about being told her creative work would not count toward tenure in her post-probationary review meeting.

170. deKenessey did not respond for approximately three months.

171. Around October 2015, Dr. Hayes met with incoming SPE Associate Dean of Faculty Affairs Gustav Peebles, who had recently been promoted to tenure.

172. During the meeting, Peebles informed Dr. Hayes that she should abandon her creative work because it would not be considered for tenure.

24

173.    The New School's Faculty Handbook explicitly states that creative work is considered a form of scholarship that is eligible for tenure.

174.    In response to her concerns about the delay of her tenure review, he stated that ten years or so "is not that bad" on the tenure track.

175.    Peebles, a heterosexual White man, had been promoted to tenure in fewer than ten years.

176.    In the same meeting, Peebles misinformed Dr. Hayes about the University's tenure requirements stating, "You have to write a book."

177.    He also condescended to Dr. Hayes—who has won several awards and honors for her scholarship—that "[the book] doesn't have to be that good."

178.    In the same meeting, Peebles informed Dr. Hayes that her best chance to improve her salary was to acquire an external job offer and negotiate an amended contract, although The New School is legally prohibited from engaging in compensation inequity.

179.    Peebles had recently done so and as a result received a promotion to tenure and an administrative leadership position.

180.    The New School continued to diminish the value of Dr. Hayes's scholarly achievements. For example, in Fall 2015, Peebles telephoned Hayes at her personal mobile phone to inquire why she was working on a television series adaptation of the novel "Land of Love and Drowning" with her colleague Tiphanie Yanique given Hayes allegedly agreed to, "forget the whole media thing."

181.    Hayes explained she had worked on the project during the summer, for which she was not paid, and that an agent was pitching the project.

182.    Peebles responded he envisioned Dr. Hayes, "running around with a camera," not engaged in serious creative work.

183.     Taking Peebles' advice, Dr. Hayes sought and received an administrative position offer at another university.

184.     The offer included a partner hire, moving expenses and—adjusting for differences in living costs—a considerable increase in salary.

**H.     The New School Offers Inadequate Mentorship**

185.     In Spring 2012, a senior colleague in the management program, Associate Professor Nidhi Srinivas, informed Dr. Hayes that all Milano tenure-track faculty would be assigned mentors to guide them through the promotion process.

186.     Successful mentorship is universally recognized as an essential component to securing tenure.

187.     Rather than assigning Dr. Hayes to a mentor invested in her scholarship and research interests, The New School assigned Associate Professor Lily Ling, a specialist in Chinese politics in the Milano School of International Affairs.

188.     As Dr. Hayes's mentor Lily Ling's mentorship consisted of nothing more than one lunch meeting and feedback on a draft article on Dr. Hayes's published in "The Journal of African American Studies."

189.     After this scant mentoring, Lily Ling was promoted to Associate Dean for Faculty Affairs in SPE.

190.     At a meeting to prepare for her post-probationary review in Spring 2014, Dr. Hayes sought Ling's support as her mentor.

191.     In response, for the first time, Ling informed Dr. Hayes that she had not been serving in that role since Fall 2013, when she was promoted to Associate Dean.

192.     In addition, Ling informed Dr. Hayes that she should have a mentor to read her post-probationary review personal statement and review her file.

193. Dr. Hayes was stunned to learn for the first time that not only had Ling withdrawn from her role as Mentor over six months ago without having informed Dr. Hayes, but also that Dr. Hayes would have to identify for herself a new mentor in order to complete her post-probationary review.

194. Despite the critical role a mentor plays in ushering the tenure track Assistant Professor to tenure, the New School failed to provide Dr. Hayes with a mentor up to, during and after the post-probationary review – making promotion to tenure a near impossibility.

195. In fact, the New School failed to provide Dr. Hayes with a mentor until the Spring 2015 – thwarting Dr. Hayes opportunity for early tenure consideration promised in her employment contract.

196. In Fall 2014, Nina Krushcheva, an Associate Professor of International Affairs with tenure, became Milano's Associate Dean of Faculty Affairs.

197. As the New School failed to provide Dr. Hayes with a mentor to replace Associate Professor Ling, Dr. Hayes met with Kruscheva and requested a mentor.

198. Approximately five months later, Dean Kruscheva appointed Lisa Servon, full Professor of Urban Policy, as Dr. Hayes's mentor.

199. During this time, a similarly situated tenure track professor hired along with Dr. Hayes in the management program received mentors who were experienced in her research topics and methods and were continuously available to provide guidance through her advancement on the tenure track.

## I. Dr. Hayes is Subjected to Discrimination and Harassment on the Basis of Her Race, Color, Gender, And Sexual Orientation

200. The bullying, harassment, and exclusion to which The New School subjected Dr. Hayes is consistent with forms of discrimination commonly aimed at women of color tenure track faculty, according to social science research.

27

201.    According to the editors of the widely cited "Presumed Incompetent," when women of color refute stereotypes by acting as a serious intellectual rather than "a mascot, cheerleader or seductress," they are punished by supervisors and colleagues by being subjected to "microaggressions."

202.    Microaggressions, according to Columbia University Professor Derald Sue, are "brief everyday exchanges that send denigrating messages to people because of their [protected class] membership."

203.    Works such as Harvard law professor Derrick Bell's "Ethical Ambition" also describe the particular hostility members of protected classes face when they are not only the highest achieving class members, but among their colleagues at large.

204.    During meetings and performance reviews, The New School routinely subjected Dr. Hayes to microaggressions as she challenged stereotypes with her exceptional academic performance and attempted to move up the professional ladder.

205.    Dr. Hayes could not escape the aggressive hostile climate anywhere in the administration, as she attempted for three years to resolve issues and have her contract honored, only to be increasingly targeted.

206.    The persistent denial of promotion, exclusion from opportunities for advancement, and inequitable compensation Dr. Hayes experienced is also consistent with colorism or discrimination based on skin color.

207.    In a widely cited scholarly article by Dr. Margaret Hunter, consensus within the social sciences holds that White people as well as people of color practice discrimination against darker skinned people particularly when it comes to employment decisions.

208.    In January 2014, The New School replaced Interim Dean Watson with Michelle DePass as Dean of the Milano School of International Affairs, Management and Urban Policy.

209.    Michelle DePass, a heterosexual African American woman married to a White male, had no previous academic experience and lacked tenure.

210.    In Spring 2014, Michelle DePass summoned Hayes to DePass's office and commented on the lack of African Americans in Milano, asked Dr. Hayes where she might find other Black faculty and staff, and expressed her plan to gather the African American faculty for lunch.

211.    Embedded in DePass's comments and conduct was the racist assumption that, as an African American faculty member, Hayes is responsible for addressing The New School's ongoing failures at equality and inclusion. This is a classic form of racial discrimination.

212.    Dr. Hayes was offended by Dean DePass's comment that assumed that Dr. Hayes because she is Black, she would have some pipeline to other potential Black faculty candidates.

213.    In late April 2015, the New School notified Dr. Hayes that she had successfully completed her post-probationary review and that they would be renewing her appointment contract.

214.    In May 2015, Executive Dean Watson summoned Dr. Hayes to a meeting but declined to specify the meeting's purpose.

215.    Upon entering the meeting, Dr. Hayes learned for the first time that the meeting was to discuss the results of her post-probationary review – a profoundly significant meeting in the tenure process.

216.    Dr. Hayes was shocked that The New School failed to give her the opportunity to prepare for such an important meeting.

217.    Deans DePass, Kruscheva, and Ponte were all in attendance.

218.    Deans Kruscheva, Watson and DePass gave Dr. Hayes racially discriminatory feedback, including:

a. Associate Dean Nina Kruscheva informed Dr. Hayes that she should "do less around diversity" in terms of service because Dr. Hayes's academic specialization already focused on it.

b. Executive Dean Watson informed Dr. Hayes that she needed to do more to demonstrate her "academic situatedness," or her place in the profession, which is widely recognized as a racially coded comment through which Watson expressed her assessment that Dr. Hayes's academic profile was substandard.

c. Although they had refused to recognize Dr. Hayes's "extraordinary service" with the New Leaders for Social Change Program, Dean DePass asserted Hayes "could be doing more" service work.

d. Executive Dean Watson stated she was unclear what "senior" professors outside of The New School would be able to evaluate Dr. Hayes's scholarship for promotion, another racially coded comment inferring the inferiority of Dr. Hayes's academic contributions.

219.    February 2016 Dean DePass summoned Hayes to a meeting with her and Watson to discuss Hayes' external offer from another university.

220.    During this meeting, DePass asked Dr. Hayes, "Why did you come here if you wanted to be all...?", using a well-known African-American colloquialism to infer Dr. Hayes was presumptuous in her request for her contract to be honored and to be treated equitably.

221.    In the same meeting, Watson informed Dr. Hayes she felt Dr. Hayes's work in support of diversity "was an essential part" of her "identity."

222.    This comment inferred that Hayes' considerable accomplishments were not due to hard work or her longtime demonstrated commitment to social justice, but simply due to her race, color, sexual orientation and gender.

223.    When Dr. Hayes expressed her concerns that she had been denied tenure review, which was a breach of her contract, Watson pointed to herself and responded, "The people who have been promoted to Associate have earned it."

224.    Once again, using racially coded language to infer Dr. Hayes was both lazy and suffering from a sense of entitlement when in fact, she was merely asserting her contractual rights.

225.    When Dr. Hayes met with Dr. Lisa Servon for the first time as mentor-mentee in spring 2015, Servon stated she was surprised Kruscheva did not assign Dr. Hayes a woman of color as a mentor.

226.    Embedded in Servon's comments was the racist assumption that Black faculty should be classed together given that all Black people have a special connection with one another, a classic form of racial marginalization.

227.    Dr. Hayes found Servon's comment offensive.

228.    At that meeting, Servon incorrectly informed Dr. Hayes, an award-winning filmmaker, that the New School does not award tenure to professors whose dossiers include creative work.

229.    Dr. Hayes found this comment highly troubling not only because the Faculty Handbook contradicted Servon's comments, but also because the remark made clear that Dr. Hayes's mentor clearly valued neither Dr. Hayes's scholarship nor her contributions to the The New School.

230.    And despite Servon's comment, since recruiting Dr. Hayes, the New School had tenured several faculty members with purely creative portfolios.

231.    And in each case, not one was an "out" lesbian or a dark skinned African American.

**J.**     **The New School Retaliates Against Dr. Hayes for Complaining About Discrimination**

232.     In January 2016, Hayes wrote the New School President David Van Zandt, Provost Tim Marshall, and Executive Dean Mary Watson to inform them of an external job offer, make a complaint about how her contributions to the University had been unduly limited, and propose an amended contract that offered solutions.

233.     Her January 2016 complaint was in accordance with the Grievance guidelines outlined in The Faculty Handbook.

234.     The New School refused to investigate her allegations.

235.     In response, Provost Marshall informed Dr. Hayes "we do not want you to leave."

236.     From February 2016 through October 2016, Dr. Hayes attempted to negotiate equitable evaluation for tenure, compensation, mentorship for her creative work, and support for her curriculum.

237.     The New School refused her requests.

238.     Between February 2016 and her termination, Dr. Hayes experienced retaliation for engaging in the protected activities of filing formal and informal complaints about unlawful discrimination based on her race, gender and sexual orientation.

239.     Beginning March 2016, The New School began using intimidation and coercive gaslighting techniques against Dr. Hayes.

240.     For example, in order to receive an increase in salary, The New School demanded Dr. Hayes sign a contract that stated she had to "complete two projects" to be successfully awarded tenure, a promotion standard that contradicts what is outlined in the Faculty Handbook.

241.     The proposed contract also required Dr. Hayes to surrender provisions in her original 2011 contract such as an office and a computer.

242. During the contract negotiations between February 2016 and October 2016, Dr. Hayes complained to Deputy Provost and Senior Vice President of Faculty Affairs Bryna Sanger and Provost Tim Marshall, that she believed she was being discriminated against on the basis of her race, gender and sexual orientation because she was not being treated equally to similarly-situated white, male, or heterosexual faculty members.

243. The New School failed to investigate Dr. Hayes's allegations.

244. In July 2016, Vice Provost Bryna Sanger refused to address Dr. Hayes's concerns and attempted to make Dr. Hayes believe she had never requested early tenure review, despite written evidence to the contrary.

245. In September 2016, Sanger finally assigns Arthur Ou as Hayes' mentor. Ou, a non-Black man, was reviewed for early tenure during the 2015-2016 academic year.

246. The assignment was too late to allow Dr. Hayes to be reviewed for tenure before 2017, in violation of her employment contract.

247. Ou was superior in rank to Hayes strictly because The New School allowed his request for early tenure review.

248. Between September and October 2016, Sanger and Marshall informed Dr. Hayes the issue of contract negotiations was "closed" and they were no longer willing to discuss it, despite Dr. Hayes's continuing complaints of discrimination.

249. In October 2016, Hayes followed The New School's grievance procedures and filed a complaint with Human Resources describing why she felt she had been discriminated against based on her race, gender and sexual orientation and identifying Watson, Marshall, and DePass among the New School staff perpetuating the discrimination.

250. Around December 2016, Dr. Hayes sent an additional letter of complaint to then Interim Vice President of Human Resources Irwin Kroot further outlining how she had been

treated adversely compared to similarly situated White, heterosexual, and male faculty members.

251.     In December 2016, Dr. Hayes met with Ilana Levitt of Human Resources.

252.     During the meeting, Levitt informed Dr. Hayes she had not investigated her discrimination complaint.

253.     Levitt also insinuated she had already made conclusions about the complaint by telling Dr. Hayes she had made "a big ask" during her contract negotiations.

254.     In fact, Dr. Hayes's requests were entirely commensurate with a faculty member of her stature and experience.

255.     The New School's written policy obligates it to conduct a fact-finding investigation into such a complaint.

256.     The New School failed to institute the requisite investigation and failed to take corrective action.

257.     Upon information and belief, to this date, The New School has not made a determination about Dr. Hayes's complaint.

**K.     Defendants Terminate Dr. Hayes's Employment**

258.     In her complaint to Human Resources, Dr. Hayes asserted she felt the aggression to which she was being subjected was an attempt to constructively discharge her.

259.     Unbeknownst to Dr. Hayes at the time, Milano School has a history of forcing tenure track faculty of color to resign before they can be considered for tenure.

260.     In February 2017, Interim Vice President of Human Resources Irwin Kroot falsely alleged Dr. Hayes did not report to class and, therefore, classified her as "resigned" and sought to remove her from the payroll beginning March 2017.

261.     Although there was a complaint pending against Watson by Dr. Hayes, Kroot routinely cc'd Watson and Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau

on his communication with Hayes.

262.     He did not inform Hayes of the content of his communications with Watson.

263.     In February 2017, Dr. Hayes vigorously disputed the claim that she had not reported to class or that she had resigned.

264.     At that time, she asked Kroot whether he had finally made a determination about her discrimination complaint. He deferred the communication to Tennent-DeCoteau without notifying Hayes of a decision in an email on which Watson was copied.

265.     On February 28, 2017, Provost Tim Marshall informed Dr. Hayes that he had discussed the matter with Executive Dean Mary Watson and the New School was terminating her faculty appointment.

266.     Upon information and belief, Tennent-DeCoteau permitted her supervisees Marshall and Watson to terminate Hayes' employment although she had a pending discrimination complaint against each them.

267.     One articulated reason for the termination was that Dr. Hayes was engaging in a "protest" because The New School was discriminating against her on the basis of her race, color, gender and sexual orientation.

268.     Another articulated reason for the termination was that Dr. Hayes had informed students that a course might be cancelled because of low enrollment.

269.     The New School falsely claimed that such a disclosure violated its policy.

270.     In fact, the University had never previously forbid Hayes from notifying students of the possibility of class cancellations due to low enrollment.

271.     A similarly situated White heterosexual Milano School faculty member took the same action during the spring 2017 semester and experienced no adverse employment action. On the contrary, The New School promoted her to tenure.

272.     The New School's Faculty Handbook states that when a tenure-track faculty member's course is cancelled for a reason such as low enrollment, faculty must either make up the course in future semesters or conduct additional service.

273.     Dr. Hayes had until the end of the semester to make up service hours or until enrollment improved over the remaining 18 months of her contract to reschedule the courses.

274.     The New School further falsely accused Dr. Hayes of failing to set up meetings in a timely manner to discuss class scheduling.

275.     In fact, Dr. Hayes attempted to address the semester's class schedule meeting in a manner consistent with her previous six years of teaching at The New School.

276.     Moreover, The New School still had not addressed Dr. Hayes's concerns about being able to develop curriculum relevant to her fields of expertise.

277.     At no time did Park, DePass, Watson or Marshall express a concern about the timeliness of Hayes's response before terminating her.

278.     The above-mentioned reasons were a pretext.

279.     The true reason The New School fired Dr. Hayes was in retaliation for her protected activity in insisting on a working environment free of racial, gender, color, and sexual orientation, pay inequity and animus.

280.     Dr. Hayes's last day of employment was March 25, 2017.

281.     After unlawfully terminating Dr. Hayes, the University denied her due process to challenge her termination provided by the Faculty Handbook.

282.     After terminating her, Marshall informed her she could challenge the termination through an internal hearing.

283.     Nonetheless, the University's General Counsel Keila Tennent refused to consider holding the hearing.

36

**L.    The New School's Demonstrated Pattern of Indifference to Hate Speech and Discrimination Complaints**

284.    In November 2016, unknown perpetrators branded swastikas-a symbol of genocidal violence against Jews, people of African descent, homosexuals, and dissenters-on four different dormitory room doors at The New School.

285.    The New School, under President Van Zandt's leadership, assigned Watson, Marshall, and DePass to lead the institution's response to this act of hate speech, despite pending complaints of discrimination based on race, gender, and sexual orientation by Dr. Hayes made against each of them.

286.    In November 2016, following the act of hate speech, Watson sent a mass email to SPE faculty inquiring if anyone knew of someone who could conduct a diversity training.

287.    Watson was aware that Dr. Hayes was in demand as a lecturer, trainer and expert in diversity related matters and had provided such training on campus.

288.    Since this act of hate speech, Watson, Marshall and Van Zandt have refused to enact any of the best practices to promote diversity commonly embraced by research universities after such an incident.

289.    This would include implementing an African American studies or Ethnic studies program, announcing a cluster hire in equality and diversity, or promoting curriculum such as Dr. Hayes's proposed Hip Hop, Media-Making and Democracy Lab or The New Leaders for Social Change program.

290.    Between the Spring 2014 and Dr. Hayes's termination in March 2017, not once did The New School offer legitimate fact-based academic reasons for the adverse employment actions to which they subjected Dr. Hayes while employed by The New School.

291.    Repeatedly, the University subjected Dr. Hayes to adverse employment actions that were in direct violation of The New School's stated policies in The Faculty Handbook, their stated

mission to advance social justice and innovation, and Dr. Hayes's employment contract.

292.    Repeatedly, The New School escalated hostility and aggression toward Dr. Hayes as she persisted in addressing the adverse employment action to which she was illegally subjected by engaging in protected activities.

293.    As a result of her wrongful termination, The New School stripped Dr. Hayes of her job, denied her tenure and profoundly impaired Dr. Hayes's ability to obtain a faculty appointment at another university.

294.    Had the New School promoted Dr. Hayes to the rank of Associate Professor with tenure, she would have been the first African American woman and the first out lesbian in the Milano School of International Affairs, Management and Urban Policy to acquire tenure since the school was founded in 1975.

295.    Dr. Hayes would also have been the first person of color between 2011 and 2017 to be promoted to tenure within the University who has dark skin.

296.    The New School's conduct has been malicious, willful, outrageous and conducted with full knowledge of the law.

297.    The New School also conducted itself with been willful and wanton negligence and recklessness or in conscious disregard for the rights of Dr. Hayes and conduct so reckless as to amount to disregard.

298.    The above facts are just some of the examples of the unlawful discrimination and retaliation Dr. Hayes experienced at the hands of The New School and the individual Defendants.

**AS A FIRST CAUSE OF ACTION
FOR DISCRIMINATION IN VIOLATION OF
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000e et. seq.,
(Against The New School)**

299.    Dr. Hayes repeats and re-alleges each and every allegation made in the above

paragraphs of this complaint.

300.    Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703](a) Employer practices, It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin.

301.    The New School engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e et seq., by discriminating against Dr. Hayes on the basis of her race, color, and gender and creating a hostile work environment that promoted discrimination against Dr. Hayes on the basis of her race, color and gender.

### AS A SECOND CAUSE OF ACTION
### FOR DISCRIMINATION UNDER TITLE VII
### 42 U.S.C. § 2000e-3(a)
### (RETALIATION)
### (Against The New School)

302.    Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

303.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer: "(1) to…discriminate against any of [its] employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter."

304.    The New School engaged in the unlawful employment practice prohibited by 42 U.S.C. § 2000e et seq. by retaliating against Dr. Hayes with respect to the terms, conditions and privileges of her employment because of her opposition to the unlawful employment practices of The New School as alleged herein.

### AS A THIRD CAUSE OF ACTION
### FOR DISCRIMINATION IN VIOLATION OF
### NEW YORK STATE EXECUTIVE LAW § 296
### (Against The New School)

305. Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

306. New York State Executive Law § 296 provides:

It shall be an unlawful discriminatory practice: (a) For an employer, because of an individual's race, creed, color, national origin, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, predisposing genetic characteristics, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or, privileges of employment.

307. The New School engaged in unlawful practices in violation of New York State Executive Law § 296 by discriminating against Dr. Hayes because of her race, gender, color, and sexual orientation; and by creating a hostile work environment.

### AS A FOURTH CAUSE OF ACTION FOR
### DISCRIMINATION UNDER STATE LAW
### New York State Executive Law §296(1)(e)
### (Retaliation)
### (Against The New School)

308. Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

309. New York State Executive Law §296(1)(e) provides that it shall be an unlawful discriminatory practice for any employer to discharge, expel or otherwise discriminate against any person because she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

310.     The New School engaged in an unlawful discriminatory practice by harassing and then terminating Dr. Hayes employment in retaliation for her opposing The New School's unlawful discriminatory practices as alleged herein, in violation of Executive Law § 296(1)(e).

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER NEW YORK EXECUTIVE LAW § 296 (7)
## (RETALIATION)
## (Against All Defendants)

311.     Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

312.     New York State Executive Law § 296 (7) provides: "It shall be an unlawful discriminatory practice for any person engaged in an activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

313.     Defendants The New School, President David Van Zandt, Provost Tim Marshall, Vice President Keila Chamaine Tennent-DeCoteau, Vice President and Deputy Provost Of Academic Affairs Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michelle DePass engaged in an unlawful discriminatory practice by harassing and then terminating Dr. Hayes's employment in retaliation for her opposing The New School's unlawful discriminatory practices as alleged herein, in violation of New York State Executive Law § 296(7).

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER NEW YORK EXECUTIVE LAW § 296(6)
## (Against All Defendants)

314.     Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

315.     New York State Executive Law § 296(6) further provides: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of

the acts forbidden under this article, or attempt to do so."

316.    Defendants The New School, President David Van Zandt, Provost Tim Marshall, Vice President Keila Chamaine Tennent-DeCoteau, Vice President and Deputy Provost Of Academic Affairs Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michelle DePass engaged in an unlawful discriminatory practice by aiding and abetting unlawful discriminatory practices as alleged herein.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (Against All Defendants)

317.    Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

318.    The Administrative Code of the City of NY § 8-107 (1)(a) provides:

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof, because of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

319.    Section 8-107(13) entitled Employer Liability For Discriminatory Conduct By Employee, Agent or Independent Contractor provides:

An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced

42

in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

320. The New School engaged in an unlawful discriminatory practice in violation of New York Administrative Code Title 8, § 8-107 (1)(a), by creating and maintaining discriminatory working conditions and a hostile work environment and otherwise discriminating against Dr. Hayes because of her race, color, gender, and sexual orientation as alleged herein.

321. Defendants President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Deputy Provost Of Academic Affairs Dr. Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michele DePass engaged in an unlawful discriminatory practice in violation of New York Administrative Code Title 8, § 8-107 (1)(a), by creating and maintaining discriminatory working conditions and a hostile work environment and otherwise discriminating against Dr. Hayes because of her race, color, gender, and sexual orientation as alleged herein.

322. Defendant the New School is additionally strictly liable for the discriminatory acts of President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Vice Provost Of Faculty Affairs Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michelle DePass under New York City Administrative Code Title 8, Section 8-107(13) as all had supervisory authority over Dr. Hayes.

**AS AN EIGHTH CAUSE OF ACTION FOR DISCRIMINATION
UNDER THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107(7)
(RETALIATION)
(Against All Defendants)**

323.    Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

324.    The New York City Administrative Code Title 8, § 8-107(7) provides, in relevant part, that it shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter.

325.    Here, Defendants The New School, President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Vice Provost Of Faculty Affairs Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michelle DePass retaliated against Dr. Hayes when she opposed their discriminatory conduct as alleged herein.

326.    Defendant The New School is additionally strictly liable for the retaliatory actions of Defendants President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Vice Provost Of Faculty Affairs Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michele DePass under New York City Administrative Code Title 8, § 8-107(13).

327.    Defendants The New School, President David Van Zandt, Provost Tim Marshall, Vice President and Vice Provost Of Faculty Affairs Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michele DePass are liable for an unlawful discriminatory practice prohibited of New York City Administrative Code Title 8, § 8-107(7).

## AS AN NINTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107(6)
### (Against All Defendants)

328.     Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

329.     The New York City Administrative Code Title 8, § 8-107(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

330.     Defendants The New School, President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Vice Provost Of Faculty Affairs. Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michele DePass engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct against Dr. Hayes as alleged herein.

## AS A TENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107
### (Against All Defendants)

331.     Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

332.     Section 8-107(19), entitled Interference With Protected Rights provides:

It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

45

333.     Defendant the New School, President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Vice Provost Of Faculty Affairs Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michele DePass engaged in coercion, intimidation, threats, interference with Plaintiff's rights protected under Title 8, § 8-107 and as such, violated Title 8, § 8-107(19).

## AS AN ELEVENTH CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against The New School)

334.     Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

335.     In June 2010, The New School and Dr. Hayes entered into a contract to join The New School's faculty of the Milano School of Management and Urban Policy as a Tenure Track Assistant Professor.

336.     The contract provided that Dr. Hayes would stand for her post-probationary review in the Summer of 2014, as a result of The New School granting her a tenure clock extension due to the passing of Dr. Hayes's mother.

337.     The New School extended her contract through July 2019.

338.     Under the terms of the contract, The New School was to review Dr. Hayes for tenure no later than her sixth year of her appointment.

339.     The Faculty Handbook states that "for promotion and tenure-track faculty will be evaluated by the following criteria: scholarship, which can be creative work, academic research, or professional practice that makes a national and/or international impact, teaching, and service to the profession or community."

340.    According to the Handbook, tenure-track faculty members must demonstrate a standard of excellence in scholarship as well as teaching or service to be promoted to tenure.

341.    The New School promised support and enthusiasm for Dr. Hayes's scholarship, which is focused on advancing learning about race and equality through teaching, service, academic research, creative practice, and nonprofit professional practice.

342.    If promoted to tenure, Dr. Hayes would be eligible for review for promotion to the rank of Full Professor provided she engaged in additional significant scholarly, teaching and/or service achievements.

343.    After being granted tenure, Hayes would have had a lifelong contract at The New School.

344.    Given the competitiveness of her qualifications, and the fit between her demonstrated commitment to social justice and The New School's public proclamations of similar support, Dr. Hayes believed The New School had negotiated and entered into their contract in good faith.

345.    However, after Dr. Hayes began her employment The New School's engrained devaluation of its faculty who are women, darker skinned, of color and LGBTQ became evident.

346.    High ranking University officers withheld support essential in gaining tenure and actively thwarted Dr. Hayes's efforts to be promoted according to the terms of her contract as alleged herein.

347.    The New School repeatedly and without justification denied Dr. Hayes's request for early tenure review, in violation of her contract.

348.    The New School refused to consider Dr. Hayes's creative work as tenure eligible work in violation of her contract, which incorporated the terms of the Faculty Handbook.

349.    Despite The New School's concerted efforts to undermine, marginalize and

discredit her scholarship and contributions, Dr. Hayes consistently performed her contract obligations at least as well if not better than her similarly situated peers who The New School promoted, including to tenure, where, in contrast, The New School fired Dr. Hayes.

350.     Dr. Hayes at all times lived up to a "high standard of professional conduct and integrity," as required in the Faculty Handbook and performed her obligations under her contract.

351.     Nonetheless, The New School did all it could to push Dr. Hayes out when she sought to hold The New School to the terms of her contract and sought pay parity with similarity situated White Assistant professors.

352.     When The New School's efforts at constructive discharge failed, The New School fired Dr. Hayes for pre-textual reasons as alleged herein.

353.     The New School further breached its contract with Dr. Hayes when it refused to her request for a hearing before the University Faculty Discipline Committee guaranteed to her under the Faculty Handbook's "Full-time Faculty, Reprimand, Censure or Removal of Privileges" provisions.

354.     In breaching the terms of her appointment contract, The New School has wrongfully deprived Dr. Hayes of a life-time tenure appointment, impaired her present and future opportunity to gain an appointment with another teaching institution, impaired her scholarship and opportunities to contribute to the field of African American Studies domestically and internationally.

355.     Termination of a tenure track professor is virtually unheard of in academics, particularly at The New School where Administrators allows sexual predators to quietly resign with their reputation and future academic prospects intact.

356.     In comparison, The New School fired Dr. Hayes without justification and denied her a hearing as required by her contract.

## AS A TWELFTH CAUSE OF ACTION
## 42 U.S.C. § 1981
## (Against All Defendants)

357.     Dr. Hayes repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

358.     42 U.S.C. Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

359.     Defendants The New School, President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Vice Provost Of Faculty Affairs Dr. Bryna Sanger, School Of Public Engagement Executive Dean Mary Watson, and Milano School Dean Michele DePass failed to honor the terms of Dr. Hayes's appointment contract when it repeatedly and without justification denied her requests for early tenure consideration, failed to provide the mentorship and curricular support and thus undermining her tenure track trajectory, refused to credit her creative work for tenure eligibility in contravention of the Faculty Handbook, and failed to comply and perform with numerous other promises contained in her appointment contract as alleged herein.

360.     Defendants The New School, President David Van Zandt, Provost Tim Marshall, Vice President of Labor Relations Keila Chamaine Tennent-DeCoteau, Vice President and Deputy Provost of Faculty Affairs Dr. Bryna Sanger, School Of Public Engagement Executive Dean Mary

49

Watson, and Milano School Dean Michele DePass further interfered with Dr. Hayes continued employment and opportunity to be tenured by firing her for pre-textual reasons.

361.    The real reason Defendants interfered with and breached Dr. Hayes's appointment contract and ultimately terminated her was because of the University's hostility to her as a dark-skinned African American as demonstrated by The New School's far reaching disparate treatment of Dr. Hayes when compared to similarly situated White faculty members as alleged herein.

362.    In doing so, Defendants violated Dr. Hayes's rights under Section 1981 to make and enforce her contract with the New School as defined under Section 1981.

363.    The New School has irreparably damaged Dr. Hayes's by violating her rights guaranteed by 42 U.S.C. Section 1981.

## INJURY AND DAMAGES

366.    As a result of the acts and conduct complained of herein, Dr. Hayes suffered and will continue to suffer the loss of a career and the loss of a salary, including a life-time appointment, overtime payments, bonuses, pension benefits and other compensation which such employment entails, and has also suffered future pecuniary losses, damaged professional reputation, destroyed opportunity at a tenured position within the academy, lost scholarship, teaching, and service opportunities in her field of African American studies.

367.    Dr. Hayes has also suffered severe emotional and physical distress as a result of Defendants' unlawful conduct.

368.    Through its unlawful discriminatory and retaliatory conduct Defendants have caused long-term and lasting damage to Dr. Hayes's career and her ability to address race and diversity in the future as a professor, artist, and scholar.

369.    Because of Defendants' unlawful acts of discrimination and retaliation, Dr. Hayes has felt and continues to feel humiliated, degraded, victimized, embarrassed and emotionally

distressed.

370.     Because of Defendants' unlawful conduct, Dr. Hayes suffered and continues to suffer severe emotional distress and physical ailments.

371.     Because of the acts and conduct complained of herein, Dr. Hayes has suffered and will continue to suffer the loss of income, the loss of a salary, a lifelong appointment, bonuses, benefits, pension, support for her scholarship that promotes inclusion and equality, opportunities to mentor and teach students committed to social justice, and other compensation which such employment entails. Dr. Hayes also suffers future pecuniary losses, emotional pain, suffering and inconvenience, loss of enjoyment of life and other non-pecuniary losses.

## JURY DEMAND

Plaintiff demands a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREAS,** Plaintiff Dr. Robin Hayes prays for the following relief:

a.  A declaration that Defendants violated Plaintiff's federal, state and city civil rights;

b.  Compensatory damages for injuries suffered by Plaintiff by reason of Defendants' unlawful and unjust conduct, in an amount just and reasonable an in conformity with the evidence at trial in an amount to be determined at trial;

c.  Punitive damages against the Defendants to full the extent allowable by law;

d.  Damages for breach of contract, emotional distress, physical injury, lost wages, back pay, front pay, benefits, statutory damages, out of pocket expenses, including medical expenses, interest and any other compensatory damages as permitted by law and according to proof at trial;

e.  Award of Plaintiff's reasonable attorney's fees and litigation costs under all applicable laws; and

f.   Such other and further relief as appears just a proper.

Dated: New York, New York
          July 11, 2018

**EISNER & DICTOR, P.C.**

By:       ____/s/ *Benjamin N. Dictor*____
              Benjamin N. Dictor
              39 Broadway, Suite 1540
              New York, New York 10006
              (212) 473-8700 (p)
              (212) 473-8705 (f)
              ben@eisnerdictor.com